## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STEPHEN L. PIERCE | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | CASE NO.: 24-679-RGA |
| | : | |
| v. | : | |
| | : | |
| DELAWARE RIVER AND BAY | : | |
| AUTHORITY | : | |
| and | : | |
| CITY OF DOVER, POLICE ACADEMY | : | |
| and | : | |
| WILLIE JOHNSON, individually | : | |
| | : | |
| Defendants. | : | |
| | : | |

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT DELAWARE RIVER AND BAY AUTHORITY'S MOTION FOR SUMMARY JUDGMENT

Respectfully Submitted,

**KARPF, KARPF, & CERUTTI, P.C.**

*/s/ Timothy S. Seiler*
Timothy S. Seiler, Esq.
8 Interplex Drive
Suite 210
Feasterville-Trevose, PA 19053
(215) 639-0801
*Admitted Pro Hac Vice*

**LAROSA & ASSOCIATES**

*/s/ John M. LaRosa*
John M. LaRosa, Esq.
Delaware Bar ID No. 4275
1225 King Street, Suite 802
Wilmington, DE 19801-3246
Phone: (302) 888-1290
Fax: (302) 655-9329
JLR@LaRosaLaw.com
*Attorney for Plaintiff*

Date: July 18, 2025

# TABLE OF CONTENTS

**NATURE AND STAGE OF THE PROCEEDINGS** ...................................................... 1

**SUMMARY OF ARGUMENT** ......................................................................................... 1

**STATEMENT OF MATERIAL AND DISPUTED FACTS** ......................................... 2

I.    Hiring and Vetting Process ............................................................................................ 2

II.   Academy Training and Blatant Discrimination ............................................................. 3

III.  Mr. Pierce's Medical Testing, Meetings with Management, Complaints, and Termination ..... 9

**LEGAL ARGUMENT** ...................................................................................................... 17

**I.    Summary Judgment Standard** .................................................................................. 17

**II.   Mr. Pierce's ADEA and ADA Claims Must Proceed** ............................................ 17

    **i.)    Mr. Pierce Was Qualified for His Position** ............................................... 17

    **ii.)    Mr. Pierce Can Establish Direct Evidence of Discrimination Based on Age and a Perceived Disability, and in Any Event Submits *Significant* Evidence of Discriminatory Intent** ................................................................................................. 18

    **iii.)    Mr. Pierce Was Perceived as Disabled** ................................................... 23

    **iv.)    Mr. Pierce's Complaints of Discrimination are Protected Activity** .......... 24

    **v.)    Mr. Pierce Presents Sufficient Evidence of Causation and Pretext** .......... 25

        **1.)    Evidence of Discrimination is Also Evidence of Pretext** ............................ 26

        **2.)    The Academy's Reasons for Dismissal Are Directly Disputed and Highly Questionable** ............................................................................................................. 26

        **3.)    Unusually Suggestive Timing** .................................................................... 29

        **4.)    Failure to Investigate** ................................................................................ 30

**CONCLUSION** ............................................................................................................... 30

# TABLE OF AUTHORITIES

**Page No.**

**Cases**

*Anania v. Daubenspeck Chiropractic*, 718 N.E.2d 480 (Ohio Ct. App. 1998) ........................... 22

*Andes v. N.J. City Univ.*, 419 F. App'x 230, 234 (3d Cir. 2011) ................................... 25

*Armstead v. Exec. Cleaning & Supply, Inc.*, 2014 WL 4659935 (M.D. Pa. Sept. 17, 2014) ....... 22

*Barrett v. Forest Labs., Inc*., 39 F. Supp. 3d 407 (S.D.N.Y. 2014) ................................. 30

*Briggs v. Temple Univ.*, 339 F. Supp. 3d 466 (E.D. Pa. 2018) .................................... 18

*Burton v. Teleflex Inc.,* 707 F.3d 417 (3d Cir. 2013) ...................................... 26

*Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir. 1987) .................................... 17

*Crist v. Focus Homes, Inc.*, 122 F.3d 1107 (8th Cir. 1997) ...................................... 22

*Deane v. Pocono Medical Center,* 142 F.3d 138, 144 (3d Cir.1998)

*Fleck v. WILMAC Corp*., 2011 WL 1899198 (E.D. Pa. 2011) .................................... 23

*Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435 (5th Cir. 2011) ...................................... 19

*Difrancesco v. A-G Adm'rs, Inc*., 2014 U.S. Dist. LEXIS 124263 (E.D. Pa. Sep. 4, 2014) ........ 18

*Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358 (3d Cir. 2008) ............................. 26

*Dolleh v. Sugarhouse HSP Gaming, L.P.*,
    2024 U.S. Dist. LEXIS 178405 (E.D. Pa. Sep. 30, 2024) ..................................... 29

*Dunn v. Wash. Cty. Hosp.*, 429 F.3d 689 (7th Cir. 2005) ........................................ 22

*E.E.O.C. v. Metal Service Co.*, 892 F.2d 341 (3d Cir. 1990) ..................................... 17

*Ellingsworth v. Hartford Fire Ins. Co.*, 2017 WL 1092341 (E.D. Pa. Mar. 23, 2017) ............... 30

*Fakete v. Aetna, Inc.*, 308 F.3d 335 (3d Cir. 2002) .................................................................. 26

*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271 (3d Cir. 2000)................................................ 26

*Freeman v. Dal-Tile Corp.*, 750 F.3d 413 (4th Cir. 2014) ......................................................... 22

*Galdamez v. Potter*, 415 F.3d 1015 (9th Cir. 2005) ................................................................... 22

*Gentile v. DES, Props.*, 2012 U.S. Dist. LEXIS 94657 (M.D. Pa. July 9, 2012) ....................... 22

*Gunther v. Shelter Grp.*, 2014 U.S. Dist. LEXIS 108881 (D.N.J. Aug. 7, 2014)........................ 22

*Guthrie v. Baker*, 583 F. Supp. 2d 668 (W.D. Pa. 2008)............................................................ 22

*Hernandez v. Spacelabs Med., Inc.* 343 F.3 1107 (9th Cir. 2003)............................................. 27

*Howell v. Millersville Univ. of Pa.,* 283 F. Supp. 3d 309 (E.D. Pa. 2017) ................................. 18

*Jajua v. Diakon Lutheran Soc. Ministries*, 299 F. Supp. 3d 645 (E.D. Pa. 2018) ..................... 24

*Jajua v. Diakon Lutheran Soc. Ministries*, 299 F. Supp. 3d 645 (E.D. Pa. 2018) ..................... 20

*Jalil v. Avdel Corp.*, 873 F.2d 701 (3d Cir.1989) ...................................................................... 29

*James v. A. C. Moore Arts & Crafts Inc./Sbar's Inc.*,
  2019 U.S. Dist. LEXIS 32832 (D. Del. Mar. 1, 2019) .......................................................... 18

*Jeffery v. Erie Cty.*, No. 23-84 Erie, 2024 U.S. Dist. LEXIS 52856 (W.D. Pa. Mar. 25, 2024) .. 18

*Johnson-Harris v. AmQuip Cranes Rental, LLC*, 2015 WL 4113542 (E.D. Pa. July 8, 2015).... 22

*Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632 (3d Cir. 1993) .......................................... 27

*Katz v. Beebe Healthcare*, 2025 U.S. Dist. LEXIS 69517 (D. Del. Apr. 11, 2025) .................... 18

*Laxton v. Gap, Inc.*, 333 F.3d 572 (5th Cir. 2003)...................................................................... 26

*Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294 (3d Cir. 2012) ............................... 29

*Lindsey v. American Cast Iron Pipe Co.,* 772 F.2d 799 (11th Cir.1985) ..................................... 19

*Mandell v. County of Suffolk*, 316 F.3d 368 (2d Cir. 2003)......................................................... 26

*Marra v. Phila. Hous. Auth.*, 497 F.3d 286 (3d Cir.2007)........................................................... 27

iii

*Martinez v. Puerto Rico*, 594 F. Supp. 2d 181 (D.P.R. 2009) ...................................... 30

*Marzano v. Computer Science Corp.,* 91 F.3d 497 (3d Cir. 1996) ............................... 17

*Massarsky v. General Motors Corp.,*
706 F.2d 111 (3d. Cir.), *cert. denied,* 464 U.S. 937 (1983) .................................... 17

*Melendez-Arroyo v. Cutler-Hammer de P.R. Co.*, 273 F.3d 30 (1st Cir. 2001) .......................... 26

*Mongelli v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 491 F. Supp. 2d 467 (D. Del. 2007) ....... 22

*Natale v. E. Coast Salon Servs.*, 2014 U.S. Dist. LEXIS 138475 (D.N.J. 2014) ........................ 26

*Palasota v. Haggar Clothing Co.*, 342 F.3d 569 (5th Cir. 2002) ................................... 26

*Palish v. K&K RX Servs., L.P.*, 2014 U.S. Dist. LEXIS 80606 (E.D. Pa. 2014) ......................... 28

*Petroci v. A. Envelope Co., LLC*, 2007 WL 1993966 (E.D. Pa. July 3, 2007) ............................. 29

*Poe-Smith v. Epic Health Servs.*, 2017 U.S. Dist. LEXIS 32907 (D. Del. Mar. 8, 2017) ............ 22

*Connelly v. Lane Const. Corp.*, 809 F.3d 780 (3d Cir. 2016) ........................................ 27

*Sempier v. Johnson,* 45 F.3d 724 (3d Cir. 1995) ...................................................... 17

*Sesso v. Mercy Suburban Hosp.*, 2013 U.S. Dist. LEXIS 34401 (E.D. Pa. 2013) ...................... 26

*Sharbaugh v. W. Haven Manor, LP*, 2016 U.S. Dist. LEXIS 161264 (W.D. Pa. Nov. 21, 2016) 29

*Shatzer v. Rite Aid Corp.*, 2015 WL 4879450 (W.D. Pa. Aug. 14, 2015) ............................... 22

*Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125 (3d Cir. 1995) ...................... 17

*Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639 (3d Cir. 1998) ...................... 27

*Stewart v. Rutgers State Univ.*, 120 F.3d 426, 431 (3d. Cir. 1997) ............................... 17

*Surman v. UPMC Presbyterian Shadyside* (UPMC),
2018 U.S. Dist. LEXIS 173381 (W.D. Pa. Oct. 9, 2018) ...................................... 24

*Terry v. Ashcroft,* 336 F.3d 128 (2d Cir. 2003) ...................................................... 26

*Torre v. Casio, Inc.*, 42 F.3d 825 (3d Cir.1994) .................................................... 17

iv

*Treaster v. Conestoga Wood Specialties, Corp.*,
  2010 U.S. Dist. LEXIS 63257 (M.D. Pa. 2010) ...................................................... 26

*Turnbull v. Topeka State Hosp.*, 255 F.3d 1238 (10th Cir. 2001) ................................................ 22

*Vierra v. Wayne Mem. Hosp.,* 2006 U. S. App. LEXIS 3062 (3d Cir. 2006) .............................. 24

*Wallace v. United Parcel Serv.*, 2006 WL 1806404 (D.N.J. June 29, 2006),
  *aff'd* 2007 WL 2988582 (3d Cir. 2007) ................................................................ 21

*Weldon v. Kraft, Inc.,* 896 F.2d 793 (3d Cir. 1990) ..................................................... 17, 28

*Wexler v. White's Fine Furniture*, 317 F.3d 564 (6th Cir. 2003) ........................................... 19, 26

*Williams v. General Motors Corp.,* 656 F.2d 120 (5th Cir. 1981) ................................................ 19

*Windham v. Time Warner, Inc*., 275 F.3d 179 (2d Cir. 2003) ...................................................... 26

*Wright v. Southland Corp.,* 187 F.3d 1287 (11th Cir. 1999) ........................................................ 19

*Xanthakos v. City Univ. of N.Y.*, 2020 U.S. Dist. LEXIS 153272 (S.D.N.Y. Aug. 24, 2020) ...... 30

## **Statutes**

42 U.S.C.A. § 12102(a)(3)(A) .......................................................................................... 23

Age Discrimination in Employment Act ("ADEA" - 29 U.S.C. § 621 *et. seq.*) ........................... 1

Americans with Disabilities Act ("ADA" – 42 U.S.C. § 12101, *et. seq*.) ..................................... 1

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff, (Stephen Pierce– "Mr. Pierce") proceeds with claims against the Delaware River and Bay Authority ("DRBA") and the City of Dover Police Academy ("The Academy") under the Age Discrimination in Employment Act ("ADEA - 29 U.S.C. § 621 *et. seq.*) and the Americans with Disabilities Act ("ADA" – 42 U.S.C. § 12101, *et. seq.*).[1] D.I.: 1. The DRBA filed its Answer on August 9, 2024.  D.I.: 9. Fact discovery closed on May 30, 2025.  D.I.: 38. DRBA moved for Summary Judgment on July 1, 2025 based on *alleged* non-disputed facts, despite the pervasive materially disputed facts in the record as to each claim; Mr. Pierce now files the instant Response in opposition thereto.

## SUMMARY OF ARGUMENT

1.      The DBRA violated the ADEA when it (a) subjected Mr. Pierce to a hostile work environment because of his age; (b) terminated Mr. Pierce because of his age; and (c) terminated Mr. Pierce because of his complaints of discrimination.

2.      The DRBA violated the ADAAA when it (a) subjected Mr. Pierce to a hostile work environment because of his perceived disability; (b) terminated Mr. Pierce because of his perceived disability; and (c) terminated Mr. Pierce because of his complaints of discrimination.

3.      Mr. Pierce adduces ample evidence of pre-text such that a fact finder could reasonably disbelieve DRBA's reasons for terminating him or find that it was more likely the result of discrimination and/or retaliation.

---

[1] Plaintiff originally proceeded with claims for defamation under Delaware Common Law and 42 U.S.C. § 1983, and for Retaliation under the First Amendment; however, in an effort to narrow the claims for summary judgment and trial, Mr. Pierce has decided to voluntarily waive those claims.

1

## STATEMENT OF MATERIAL AND DISPUTED FACTS

### I.  Hiring and Vetting Process

Mr. Pierce applied to the DRBA in February 2023, when he was 52 years old. D.I. 1, ¶ 20; Pierce Dep. ("Pl.Dep."), Exhibit A, p.74:16-24. Subsequently, Mr. Pierce was hired by the DRBA. Pl.Dep. pp. 75:16-76:9. Importantly, in order to complete the hiring process, before attending training at the Academy, Mr. Pierce (as with all recruits) was required to pass a *grueling* vetting process, proving he was physically, mentally, and medically qualified to train at the Academy and to perform the job. *Id.* This included passing a written test, a psychological evaluation, a physical fitness test, a physical fitness examination by a physician selected by DRBA, a second "fit test" on a treadmill, an oral examination with a panel of officers, and a one-on-one interview with the Administrator, McFadden. Pl.Dep. pp.75:16-76:9; 82:5-23; Draham Dep. ("Draham Dep."), Exhibit B, pp. 13:18-15:17; 20:10-19; McFadden Dep. ("McFadden Dep."), Exhibit C, p. 28:18-29:12; Weaver Dep. ("Weaver Dep."), Exhibit D, p. 17:2-18:21. This information was received by the Academy as well. Johnson Dep. ("Johnson Dep."), Exhibit E, p. 63:15-18. Mr. Pierce further completed a training program with the DRBA for a month prior to attending the Academy. Pl.Dep. pp.76:14-77:4; Draham Dep. pp. 13:18-15:17. McFadden confirmed that Mr. Pierce was qualified for the position he held when he was hired. McFadden Dep. p. 28:14-17.

DRBA's leadership, and Mr. Pierce's management specifically, made *very clear* to Mr. Pierce in the leadup to training at the Academy that **they were *well aware* that his protected status as an older individual was going to be an issue for him at the Academy**. Pl.Dep. p.43:14-54:55. Specifically, while his younger counterparts were simply cautioned to stay physically fit, Mr. Pierce was *repeatedly* directly warned by Lieutenant Weaver, Sergeant Draham and McFadden, "**at least five times**" in the month leading to his attendance at the Academy, including

in the presence of other cadets, that **Mr. Pierce "was going to be a target because of [his] age."**
*Id*. He received similarly derogatory commentary from DRBA officers. Pl.Dep. pp.160:14-161:21.

## II. Academy Training and Blatant Discrimination

Mr. Pierce's class at the Academy was comprised almost exclusively of individuals in their
20s-30s in age, and Mr. Pierce was the oldest. Class 6 Roster, Exhibit F; Johnson Dep. p. 50:4-5.
Despite his age, however, Mr. Pierce was in *excellent* physical condition, and not only passed his
initial day 1 physical test upon entry to the Academy (separate from his vetting process with the
DBRA), but passed each and every physical fitness test and/or training regimen that was thrust
upon him throughout his months of his training, often outperforming his younger counterparts.
Response to DRBA Rog. No. 6, Exhibit G; Carter Affidavit, Exhibit H; Johnson Dep. pp. 64:20-
65:6; 103:4-20; Smith Dep. ("Smith Dep."), Exhibit I, pp. 35:20-36:7(explaining that first day is
one of the most vigorous and people may not make it through); Academy Handbook, Exhibit J, p.
12-14. The Academy at the time was run by Master Corporal Willie Johnson (Head of the
Academy), who was responsible for running the daily operations, including supervising staff and
cadets. Johnson Dep. pp. 11:7-12; 13:13-20; 14:11-19; 15:19-22. He maintained curriculum,
schedule, instructors, disciplinary action (which can include writings and/or physical punishment)
and performance reports provided by the Academy. Johnson Dep. pp. 15:23-18:1; Smith Dep. p.
42:15-24; Pierce Affidavit, Exhibit K. Johnson also makes decisions on whether to dismiss cadets.
Johnson Dep. pp. 22:23-23:2. At the Academy, recruits are provided with tools and equipment, a
uniform (which is inspected), a handbook (specifying schedule, rules, requirements, gear, etc.), a
schedule, and the performance of recruits is continuously evaluated by Academy staff and reported
to Johnson.  Johnson Dep. p. 35:10-24; 63:10; 104:1-4; Exhibit J, p. 5, 11; Exhibit K. The Academy
creates lesson plans for courses outlining what recruits are required to bring and have, to learn,

and what equipment to utilize. Johnson Dep. pp. 30:20-31:1. Files are also kept for each recruit at the Academy. Johnson Dep. p. 63:15-24. All training is completed on Academy grounds, and the recruits were required to follow all directives of instructors and staff. Exhibit K.

Unfortunately, throughout his time with the Academy, as was apparently expected by DRBA management, ***on a daily and weekly basis***, Mr. Pierce was subjected to blatant, highly inappropriate discriminatory commentary and disparate treatment from Academy management.[2] Exhibit G; Pl.Dep. pp. 165:13-166:10; Exhibit K. For instance, despite passing fitness tests and often outperforming his younger counterparts, *anytime* Mr. Pierce did anything physical (and despite that others breathed heavily to catch their breath), he was continually being singled out by the staff disparately from younger cadets, including by Johnson, asking him ***if he was going to live***, why he is hyperventilating, and other continual discriminatory comments not made to those that were younger. Exhibit G; Exhibit K. By way of example, during a test close to his termination from employment, Mr. Pierce had to tread water for 5 minutes (which he did better than others), and Johnson made many comments to him such as: "I don't want to be responsible for you dying," asking Mr. Pierce if he was in "cardiac arrest," and other iterations of these comments.[3] *Id.* In ***most*** situations, Mr. Pierce was referred to as "Pops,"[4] "Old man," "Pop-Pop," "Grandpop," "Old Bastard," "Stone Age," or the "senior citizen," and not by his name, by ***all of the Academy management***. Exhibit G; Pl.Dep. p. 84:6-86:12; 87:11-23. Burton for example would yell out when Mr. Pierce was in formation with other cadets; "Pops, raise your old ass hand." *Id.* Egregiously, because Defendant Academy's management perceived Mr. Pierce as unable to do the

---

[2] Although Defendants appear to imply that Mr. Pierce did not testify to much discriminatory commentary from management during his deposition, Defendant questionably *never asked* Mr. Pierce about the same, despite his interrogatory responses and complaint directly describing such examples. Therefore, Mr. Pierce cites to the same.

[3] Johnson admits such comments are entirely inappropriate to make at the Academy. Johnson Dep. pp. 70:18-23. The handbook also states "Practical joking or horseplay will not be tolerated." Exhibit J p. 27

[4] Johnson also admits that *everyone* called Mr. Pierce "Pops" because of his age, which is not surprising, as these comments are evident from the videos produced. Johnson Dep. pp. 75:24-76:9.

role at his age, **Mr. Pierce was even required, <u>unlike other recruits</u>,**[5] **to purchase a watch within his first week at the Academy** *<u>that monitored his heart rate</u>* because of concerns about his perceived health, despite that watches *were not even permitted at the site*. Exhibit G; Johnson Dep. pp. 38:8-19; 89:15-90:5; Draham Dep. p. 22:12-19 (finding heart monitor requirement odd and a first). Mr. Pierce had to state what his heart rate was to management, unlike other recruits. Exhibit G. He was the only individual to use such a device in his class, and it was required for him despite that Johnson *admits* that Mr. Pierce was passing his fitness tests to that point. Johnson Dep. pp. 39:10-40:6; 40:17-19; Exhibit G. Obviously, this was humiliating and discriminatorily degrading for Mr. Pierce. Exhibit G. Defendant Academy's management would also ask Mr. Pierce "why the hell are you doing this at your age" or claim without justification "you are a liability." Exhibit G. Mr. Pierce was also told he is going to cause the Academy to have report a "fatal incident" (as in Mr. Pierce would die from exercises). *Id.* When performing drills, Johnson and other management would make comments such as, "your old ass won't be able to apprehend anyone," "keep running past Pops even if he is lying face down on the floor," and about Mr. Pierce being unable to provide backup to anyone. *Id.* Other cadets were not similarly given such nicknames or treated in such a manner. Pl.Dep. p. 83:14-22; Exhibit K. He was also grouped with the other individual of the class who was advanced in age, Marco Castellanos, and given the name "the old bastards." Pl.Dep. pp. 85:10-86:23. Separate and apart from daily age discrimination commentary, the Academy's management had made many comments <u>expressing a perception</u> that Mr. Pierce had heart-related problems, would die of physical exertion, him being a liability, and a host of other comments about Mr. Pierce suffering cardiac arrest and being unable to handle more

---

[5] Younger recruits were not given this same mandate despite having *actual* objective diagnosed health episodes such as Astacio having a stress induced rash and Fischer requiring an inhaler and falling behind in training. Johnson Dep. pp. 90:15-91:9; 95:1-15.

extreme training. Exhibit G.

Because Academy management made age-related or health and heart-related discriminatory comments daily and weekly to Mr. Pierce, it created an atmosphere of acceptance of such discrimination. *Id.* As a result, others even in non-management believed it was appropriate to call Mr. Pierce old man, pops, or to make other ageist comments or jokes, often laughing at Mr. Pierce or making assumptions about him due to the blatant targeting from the staff, causing him great distress. Exhibit G; Pl.Dep. pp.40:13-42:7; 87:11-23; 91:4-9. Mr. Pierce testified that the remarks would result in "a lot of laughter" when used towards him. Pl.Dep. p. 90:14-16. This atmosphere had an effect of alienation based upon discriminatory characteristics. *Id.*

Mr. Pierce was also continually held to different standards for testing, drills, or exams than other younger cadets. Exhibit G. Throughout his training, Mr. Pierce performed well, and had not displayed any sort of excessive fatigue, dizziness or shortness of breath. Pl.Dep. pp. 190:17-191:20; Exhibit K. Some of Mr. Pierce's classmates, however, had shown to be *so* fatigued from training that they were even physically incapable of walking back to the classroom to finish a drill. *Id.* As admitted by the Academy's own witnesses, many also struggled greatly with physical testing, and it was not uncommon for them to physically display nervousness, cry, or breath heavily, which are admittedly not supposed to be utilized against recruits "as long as they can do the duties." Johnson Dep. p. 93:3-8; Smith Dep. p. 62:1-20. Mr. Pierce, unlike others, however, had to retake testing just for breathing heavily, despite that nearly all cadets were breathing heavy after significant physical testing. Exhibit G; Johnson Dep. p. 69:1-5 (breathing heavy not a legitimate reason for retesting). As a result, Mr. Pierce had to mask heavy breathing unlike younger colleagues just to be passed in testing. Exhibit G. Some younger officers fell during testing, which should have resulted in failure or removal but were retained nonetheless. *Id.* Other cadets failed in

various manners but were treated more favorably than Mr. Pierce, or even given praise. *Id.*

Separately, Academy management would also disparately humiliate Mr. Pierce in multiple ways. *Id.* To give one example, Academy Staff Smith took pictures of numerous Cadets to catch them sleeping at times during training or classes. Exhibit G; Pl.Dep. pp. 130:1-132:1. Mr. Pierce was merely reading his notes, but because he was looking down in a photograph taken of him, Johnson informed the entire class that Mr. Pierce was sleeping, unlike others who were actually sleeping. *Id.* Further, it should have been obvious Mr. Pierce was reading, as he was wearing prescription reading glasses. *Id.* After repeatedly insisting he was never sleeping when questioned, Johnson, in front of the class, threatened to *ruin Mr. Pierce's career*, report him for dishonesty, have him barred from testifying for being a "liar," and to report him to various agencies for misconduct. *Id.* His abuse of Mr. Pierce was terrifying to him, but consistent with the ongoing harassment. *Id.* Johnson informed Mr. Pierce he would give him 1 final chance to admit he made a mistake and fell asleep before he engaged in the above-referenced immediate actions against him, at which time Mr. Pierce was so worried about his career, that he through was through duress compelled to say he admits making a mistake. *Id.* The following day, Smith told the class he was just reading his notes, wasn't sleeping, and stated he took a picture of Mr. Pierce when he was blinking intentionally, joking about the situation. *Id.* Mr. Pierce had extreme anxiety about this incident and other similar forms of mistreatment and abuse. *Id.*

In fact, Academy witnesses, including Johnson (who has no medical training), *directly admit* that they were concerned that Mr. Pierce could have a "series" of medical issues or a "medical episode," including a belief he would have a heart attack or go into cardiac arrest (**despite that he was known to have formally been cleared to train by underlined actual medical professionals**, as outlined *supra*), which was discussed amongst management pertaining to *every* physical testing.

Johnson Dep. pp. 42:24-44:1; 44:18-25; 46:9-11; 53:11-16; 69:24-70:23. However, Mr. Pierce never had any medical episodes (unrelated to a minor physical injury he temporarily sustained), and Academy staff never had him medically reevaluated for their entirely unsubstantiated beliefs about his health. Johnson Dep. pp. 45:1-5; 55:3-16. Academy documentation similarly evidences that its management, including **Johnson specifically,** *directly considered Mr. Pierce's age* **in making decisions pertaining to his training,** *including testing* (contradicting his testimony). *See* Daily Report, Exhibit L, p. 4; Baton Test Report, Exhibit M. A daily report shows that **the heart monitor was recommended to Pierce in part because of** "**his age**." Exhibit L, p. 4.[6] Mr. Pierce's initial baton test results, which he purportedly failed before later passing, show that Johnson stopped the test in part because of "Pierce's age," *which he admits was a factor*. Exhibit M; Johnson Dep. pp. 96:8-98:15. The video of Mr. Pierce's OC spray testing similarly reveals a reference to Johnson about Mr. Pierce being "the 51-year-old," with Johnson admitting to having discussions about his age in the past. Johnson Dep. pp. 129:22-130:17.

Mr. Pierce emphasized during his deposition that "I knew that the staff was not encouraging me. They were just insulting me." Pl.Dep. pp.54:23-56:7. Mr. Pierce described the treatment as "week in, week out, from everybody, including the academy staff, every instructor that came in to conduct class, without fail," that it was "degrading," "humiliating," and "continuous," but he still "continued to perform." Pl.Dep. pp. 165:13-169:7.

Several of Mr. Pierce's fellow cadets expressed empathy to him for what they witnessed, although some expressed they were too worried to stand up for him. Exhibit G. Tellingly, the discrimination Mr. Pierce faced is *directly* corroborated by his former classmate, Joshua B. Carter;

---

[6] Management claims daily reports like this were maintained throughout Mr. Pierce's training, yet this is the *only* week of reports produced in discovery, which tellingly directly references a decision made based on Mr. Pierce's age. Johnson Dep. p. 91:10-24; Smith Dep. pp. 30:24-31:24.

a younger cadet who observed what transpired. Specifically, he has affirmed that:

(a) I know Pierce is 52 years old because he was asked about his age many times by Management in front of classes (often referencing he was the oldest candidate or recruit).

(b) Virtually anytime Pierce was talked to, he was called "Pops" or something other than his actual name. Comments to him were focused on his advanced age. But he was called Pops daily by Management, as opposed to his name.

(c) I heard Johnson refer to Pierce as "Old man," to "raise his old ass hand," question why Pierce would start academy at his age, and other iterations of this type of commentary.

(d) There was a lot of focus on what appeared to be select people Management wanted to quit or weed out. Pierce was clearly one of those people whom Management focused on in what appeared to be an effort to get him to quit or somehow cease being in the academy.

(e) If we did physical activities such as running or boxing, negative comments were made about Pierce dying, going into cardiac arrest, or questioning if his heart stopped. I specifically recall Johson yelling during an outdoor running activity we have to "stop because Pop's heart will explode if we keep going.

Exhibit H. Carter further confirmed that Mr. Pierce performed better than others, seemed to be in fine physical shape, and it was clear he was "continually singled out" where he and others "were not allowed to advocate for one another." *Id*. Despite what he faced, however, Mr. Pierce was nevertheless being informed by the staff, including Johnson, that he was doing well, and up until the point of his dismissal, he ***had ultimately passed all the training he had performed, including physical and academic testing.*** Johnson Dep. pp. 64:20-65:6; 103:4-20; Exhibit G.

### III.    Mr. Pierce's Medical Testing, Meetings with Management, Complaints, and Termination

In December of 2023, Mr. Pierce was tested on the same matter, an emergency response scenario test – the "ERST", three (3) times in total and dismissed from Defendant Academy based upon the same. Exhibit G. This testing is comprised of two parts, a practical examination providing medical aid and an oral question and answer examination. Pl.Dep. p.94:12-95:16. On December 8, 2023, Mr. Pierce took the first ERST. Exhibit G. Cadet Fischer, who was admittedly considered

a "weak performer" by management, was chosen to be Mr. Pierce's assigned partner with equal responsibility for their initial ERST test. Alderson Dep. ("Alderson Dep."), Exhibit Q, p. 19:9-17; Exhibit G. Smith stated for this test, "medical scissors will not be used, only simulated, and no clothes are to be removed from the victims in the emergency response scenario test." Exhibit G. Yet, Mr. Pierce was informed they failed part 1 for not removing a victim's vest, which was directly contrary to Smith's directives.[7] Exhibit G. Together they failed the scenario without making it to the Part 2: oral exam portion. Pl.Dep. p. 93:7-1; 95:21-96:8. Suspiciously, Mr. Pierce's examination rubric for this exam has "pass" grades scribbled out and changed to "fail" grades, without explanation. Rubrics, Exhibit N; Alderson Dep. at 32:17-33:3. Upon retest, hours later, Mr. Pierce was informed that he passed the practical scenario (Part 1) but failed due to "taking too long" to answer the oral questions (Part 2). Pl.Dep. p. 96:9-22. However, no time-limits were ever previously verbalized, nor were timers used during the test, and Instructor Rankin even admits that this should not result in failure.[8] Exhibit G; Rankin Dep.("Rankin Dep."), Exhibit P, p. 52:16-18. Furthermore, although Johnson claims that all such examinations are videotaped, there are suspiciously no videos of Mr. Pierce's first two attempts. Johnson Dep. p. 29:9-21; 66:8-15; 102:6-9; Rankin Dep. at p. 32:16-21. Rankin contradicted Johnson's testimony that all such tests are recorded, stating that they were not typically recorded, and Mr. Pierce's test was only recorded because they "were asked" to do so because it was such a unique circumstance. Rankin Dep. pp. 32:16-33:25; Smith Dep. pp. 36:21-37:1(Johnson asked for it).

Although it was already abundantly clear given the consistent unabating discriminatory commentary and disparate treatment that Mr. Pierce had faced for months of his training to that point, the Academy made its discriminatory intent *exceptionally clear* during an private

---

[7] Although the Academy now submits a different explanation, this is also directly disputed by Mr. Pierce. Exhibit K.
[8] Any alleged confusion or failure to properly answer these questions is also disputed. Exhibit K.

conversation with him in mid-December of 2023, roughly a week after the initial ERST test and retest, just before Mr. Pierce was to attend ALERRT training. Exhibits G, K. Specifically, Mr. Pierce was informed by Johnson that Defendant Academy's management programs and testing are going to be getting "extreme." *Id.* Mr. Pierce was further told there **was concern whether he can handle it and about whether he could have a "cardiac" incident.** Exhibit G *see also* Johnson Dep. pp. 84:22-25; 86:10-21(admitting to conversations with Pierce about concern of whether he could physically complete remaining training based on his health). As in the past, Mr. Pierce had reiterated he is in fine medical shape and exceeded fitness testing previously. Exhibit G.

In fact, there is even *a recorded meeting* between Mr. Pierce and Johnson from December 13, 2023. Johnson Dep. pp. 125:21-25. During this meeting, in which Mr. Pierce is referred to as "pops," Johnson states it's not about "technique" or "safety violations", and that he does "very well" in PT, but that there would be upcoming scenarios that would "push your fitness level to the max" or be "more stressful" and that "***I don't want to put you in a position in which your health is going to be compromised***." Meeting Transcript, Exhibit O, pp. 2:2-7; 3:1-17; 4:21-5:5. He also describes stopping baton training (which was admittedly *because of his age*), "because if I pushed it any further, I was afraid of what was going to happen." *Id.* 4:5-14. He also claimed to have taken management "to the side and we're already pre-gaming, like, what we could possibly do, if there was a medical emergency, right? Because at this point, I just feel as though it's possible. And I'm not a doctor." *Id.* 8:12-16 He further stated "I'm concerned for your health man, your safety… We're going on record that this is a thing at this point, because ***I got to protect myself and I got to protect my instructors***." *Id.* 11:4-8. However, he claims that due to his concern about the purportedly "more stressful things that are going to take place," "***I'm not going to put you through all that, and I know that you're hurting yourself***…if I feel as though—I feel like you're getting

ready to—anything health-wise getting ready to happen, I'm going to pull you to the side. Okay? I have to." *Id.* 13:6-17. Hudson also added that "what we're concerned with, is that, you know, ***if you have some type of, you know, heart attack or you pass out***, things like that, we are just concerned that we'll have to rush in to your aid. And that's the only thing we're saying." *Id.* 15:1-5. Johnson concluded by saying with the upcoming training "***just know it's not personal if I pull you aside, all right, and I say, 'Hey, we're done with this…I got to save you from yourself, if it comes to that***." *Id.* 16:10-22.

Suspiciously, shortly thereafter, close to Christmas break in December, Mr. Pierce received an abrupt and unexpected phone call from McFadden indicating that he was inexplicitly "worried about" Mr. Pierce. Pl.Dep. pp. 51:20-52:12; 54:23-56:14. In turn, Mr. Pierce identified to McFadden that the staff were "really saying disrespectful things" to him, and "***insulting [him] and targeting [him] for [his] age and… trying to embarrass and—and humiliate [him]***." *Id*. Mr. Pierce also shared the related comments being made about his age and health. Exhibit K. In response, no investigation or other action was undertaken, but instead, Mr. Pierce was just told to "hang in there." Pl.Dep. p.56:8-14; Johnson Dep. p. 80:3-5; McFadden Dep. 34:17-19; Exhibit K. During Mr. Pierce's last month of training at the Academy, he had on several occasions mentioned to various supervisors he didn't think it was appropriate or right to keep referencing his age, which included Mr. Pierce mentioning both impropriety towards his age and perceptions of his health problems, as he was able to keep up more than most. Exhibit G. Mr. Pierce would be laughed at or ignored when registering such concerns, and the harassment continued. Exhibits G, K.

Shortly after expressing their disbelief to Mr. Pierce that he would be able to complete the upcoming portions of the academy directly due to his age and perceived health conditions, and in very close proximity to McFadden's impromptu call to Mr. Pierce wherein he reiterated his

concerns of discrimination, Mr. Pierce was then required to perform his 2nd ERTS retest on December 28, 2023. Exhibit G. Prior to this examination, despite that it was a common practice to do so with Mr. Pierce's younger counterparts who purportedly failed examinations, ***Mr. Pierce was not provided with any remedial training***, and he was simply instructed to study on his own. Pl.Dep. pp. 97:14-24; 98:17-102:8; Johnson Dep. pp. 23:3-24:25; 36:25-37:13; 83:15-84:15 (explaining remedial training is typically done between testing with an instructor); Smith Dep. pp. 23:24-24:12; 29:1-30:18 (remedial training is class effort and they perform mock examinations). Upon the 2nd retest, Mr. Pierce expected only to complete Part 2, since he had already passed Part 1 previously. Exhibit G. However, Mr. Pierce was inexplicably told he must complete ***the entire*** exam again. Exhibit G; Pl.Dep. p. 101:1-12. Other cadets failed various tests, which was not uncommon, but they were not required to retest on parts they had previously passed when testing included multiple parts. Pl.Dep. p. 101:1-12; Draham Dep. p. 23:13-16; Exhibit G. Mr. Pierce, however, was required to retest on part 1 (the scenario) despite previously passing, despite that the "***only***" goal was "to see that they can correctly do the skills." Rankin Dep. p. 26:1-6. Mr. Pierce completed the scenario and oral questions on the same day. Exhibit G.

Upon completion of that 2nd retest, Corporal Smith and two other staff informed Mr. Pierce that he passed the oral exam (Part 2) but failed the scenario (Part 1) due to "not tying a tourniquet tight enough," "not noticing a single chest seal fell out of [his] pocket" while pulling out other items when administering care, and using his assisting officer "for too long of a time period." Exhibit G; Pl.Dep. p. 97:3-7; Rankin Dep. p. 62:2-10; Alderson Dep. p. 17:24-18:9. Academy management claims that tourniquet placement was what resulted in the failure, despite also admitting it was properly tightened during the examination. Rankin Dep. pp. 51:7-24; 57:19-23; Alderson Dep. pp. 20:16-25; 22:1-3; 21:5-9. Tourniquet level of tightness, a single item falling

from a pocket and time of officer assistance were not given measurable parameters during classroom instruction. Exhibits G, K. In any event, Mr. Pierce's tourniquet *was* properly placed, and there was no instruction or direction as to time limits on how long you could utilize the assisting officer (which was a permissible tool, per instruction). Pl.Dep. pp. 112:5-13; 118:4-119:14; Exhibit K. None of the 3 rationales given for Mr. Pierce's failures were realistic or plausible, and all were based on subjective analyses. Smith Dep. at p. 68:1-69:6-16 (explaining whether to fail someone has a level of subjectivity). The Academy was instead just, from an objective vantage point, creating a paper trail to assert it supposedly gave him multiple opportunities, but he was unable to successfully pass the ERST, manufacturing a false justification to remove him from the program). Exhibit G. Although there are allegations that Mr. Pierce struggled placing the victim in a recovery position or took too long to answer questions, this is also untrue, and entirely subjective. Pl.Dep. p. 110:8-13; 114:10-18; Exhibit K. Others had similarly been permitted to pass despite *admitted* testing deficiencies, such as having an incorrect recovery position and failing at wound packing. Alderson Dep. pp. 35:20-36:23; Exhibit N (showing skills listed on rubric). Further, despite now claiming that Mr. Pierce failed this practical exam, he was nevertheless permitted to proceed to the oral exam, which is typically not done **unless the recruit has passed the practical examination after a conference with management immediately following the practical examination**.[9] Rankin Dep. pp. 45:20-25; 46:23-47:4; 52:22-53:5; 58:16-23; Alderson Dep. p. 18:10-12; 25:21-26:12; Smith Dep. p. 23:19-23. Mr. Pierce was not permitted to retest despite that there is no written policy on the number of times that an individual is permitted to test, and that others were permitted more than two retests for failed tests. Johnson Dep. p. 25:1-3; Rankin Dep. p. 30:21-25; *See* December 28, 2023 Reprimand, Exhibit R

---

[9] Rankin and Alderson could not even explain why they would have done the oral examination if he failed the practical. Rankin Dep. at p. 58:16-2; Alderson Dep. at pp. 27:16-28:1.

(showing Frazier, age 21-25, no health conditions, only being given a "written reprimand" for failing an exam despite being on academic probation for failing grades, having "multiple" prior failures, and being told "he needed to pass all future tests"); Smith Dep. p. 67:23-68:9. In fact, Mr. Pierce was the first recruit who was ***ever*** dismissed from the Academy for a failed medical test. Johnson Dep. 61:24-62:3; Rankin Dep. 33:18-25. The decision was made by Johnson. *Id.* 80:12-81:12; Rankin Dep. at 44:7-13; Smith Dep. at 58:20-59:11.

Tellingly, the *only* other individual who was at least 40 years old in Mr. Pierce's class, Marco Castellanos, was also dismissed for purportedly failing the baton test three times; a subjective evaluation that Mr. Pierce was initially failed for because of his age. Exhibit F. The only other individual in the class dismissed for an alleged testing failure, Micha Bowman, ***was later permitted to return to the Academy at the same point in training she left and graduated***. Exhibit F; Johnson Dep. p. 92:7-93:2; Smith Dep. p. 59:3-60:6.

Upon being released by the Academy via exit termination processes, Mr. Pierce was again reminded by Academy management, just as Mr. Pierce was told in mid-December 2023, that it was in his best interest because the program was about to get "extreme" with physical testing and they didn't want him to have a "cardiac" incident. Exhibit G. Following months of harassment and abuse, Mr. Pierce was then required to complete an exit interview form, directly in front of Johnson, who had previously threatened to sabotage his career for *completely false* justifications, as outlined *supra*. Pl.Dep. pp. 127:3-128:10; 130:1-133:12. As a result, being confident that he would not be in a position to receive the credentials he earned with the Academy if he charged Johnson with discrimination in that moment, thereby hindering his career, he filled out the same in a manner that would be expected, under duress. *Id.*

However, as soon as he had the opportunity to speak with the DRBA, he made clear that

he believed his dismissal was the direct result of discrimination to DRBA supervisory staff and its Integrity / Compliance management. Exhibit G. Specifically, the day after his dismissal from the Academy, Mr. Pierce returned to the DRBA to return his equipment from the DRBA on December 29, 2023. Pl.Dep. p. 137:3-19. While there, Mr. Pierce met with Draham and Weaver, expressing the "various forms in which [he] was discriminated against and ridiculed and humiliated by the staff at the Dover Police Academy," and "interest in filing a complaint." Pl.Dep. pp. 138:17-139:18; Draham Dep. p. 26:21-28:9 (confirming complaint of age discrimination). Draham forwarded this complaint to McFadden. Draham Dep. p. 28:10-24; McFadden Dep. p. 35:11-36:15; 44:17-23. In response, Draham and Weaver refused to look into his concerns despite being responsible for escalating the same, and Mr. Pierce was simply informed "there's nothing we can do." Pl.Dep. p. 158:2-160:13. As a result, Mr. Pierce decided to escalate his concerns to Darryl Anderson in DRBA's Human Resources Department. Pl.Dep. pp. 145:20-151:9; Crowell Dep. ("Crowell Dep."), Exhibit S, p. 21:2-18. To that end, Mr. Pierce called twice, leaving voicemails detailing his concerns and interest in filing a complaint, but he never received so much as a return phone call. *Id.* Any of these complaints should have resulted in an escalation to the Chief Human Resources Officer, Crowell, and an investigation. Crowell Dep. p. 15:16-23; 22:11-23:19; 38:4-11; 39:12-40:12. Despite his multiple complaints to McFadden, Draham, Weaver, and HR, DRBA did not: (a) interview Mr. Pierce or others; (b) conduct an investigation; or (c) attempt to remediate or resolve the allegations of discrimination by the Academy. Exhibit G; Crowell Dep. p. 40:10-12. Instead, DBRA proceeded to terminate Mr. Pierce's employment, ratifying such discriminatory and retaliatory treatment of him. Exhibit G.  This is despite that they could have sent him back to the Academy or to a different academy that did not engage in such blatant discrimination. Johnson Dep. p. 87:3-18; Weaver Dep. p. 32:5-20.

16

## LEGAL ARGUMENT

I.    **Summary Judgment Standard**[10]

II.   **Mr. Pierce's ADEA and ADA Claims Must Proceed**

i.)   **Mr. Pierce Was Qualified for His Position**[11] [12]

The DRBA first argues Mr. Pierce was not qualified for his position because he was dismissed from the Academy (despite knowing it was for illicit purposes, explained *herein*). However, there is no question Mr. Pierce was qualified for the role. He passed a grueling series of tests to be hired by the DRBA, including a written test, a psychological evaluation, a physical fitness test, a physical fitness examination by a physician selected by DRBA, a second "fit test" on a treadmill, an oral examination with a panel of officers, and a one-on-one interview with the Administrator. In fact, McFadden, responsible for running the DRBA, himself confirmed that Mr. Pierce was qualified for the position he held when he was hired. This is more than sufficient to

---

[10] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, "a court does not resolve factual disputes or make credibility determinations, and must view facts and inferences in the light most favorable to the party opposing the motion." *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

   The Third Circuit has expressly stated that it applies the standards for summary judgment with "added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Stewart v. Rutgers State Univ.*, 120 F.3d 426, 431 (3d. Cir., 1997)(emphasis added). "Employment discrimination cases center around a single question: why did the employer take an adverse employment action against plaintiff? Because this 'is clearly a factual question,' *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 899 (3d Cir. 1987) , summary judgment is in fact rarely appropriate in this type of case. Simply 'by pointing to evidence which calls into question the defendant's intent, the plaintiff raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment.' *Id; Sempier v. Johnson*, 45 F.3d 724, 732-733 (3d Cir. 1995) (cases in which plaintiff attacks employer's stated reasons for adverse employment action 'must be resolved by a jury and cannot be resolved on summary judgment')." *Marzano v. Computer Science Corp.,* 91 F.3d 497, 509-10 (3d Cir. 1996)(internal citations in original).

[11] It is well established that a plaintiff's burden to establish a *prima facie* case "**is not intended to be onerous**." *Sempier v. Johnson*, 45 F.3d 724, 728 (3d Cir. 1995); *see also Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir.1994)(describing *prima facie* case as "**relatively simple**"); *Massarsky v. General Motors Corp.*, 706 F.2d 111, 118 (3d. Cir.), *cert. denied,* 464 U.S. 937 (1983)(describing *prima facie* case as "easily made out").

[12] "[I]t is axiomatic in the case law of the Third Circuit that in order to be considered 'qualified' for purposes of a prima facie case of discrimination, *a plaintiff is only required to show that []he possessed the objective qualifications for the position at the time of the termination of h[is] employment*. *See Weldon v. Kraft, Inc.,* 896 F.2d 793 (3d Cir. 1990); *E.E.O.C. v. Metal Service Co.*, 892 F.2d 341, slip op. at 13 (3d Cir. 1990)(courts should be sensitive to myriad of ways such an inference can be created).

find that Mr. Pierce was well qualified for the role. Although the DRBA attempts to use its alleged reason for termination to also claim that he was not qualified, not only is this basis entirely false for the reasons identified in Mr. Pierce's pretext analysis, incorporated *herein*, but numerous courts consistently hold that such an analysis is better left for pretext;[13] not qualification.

> **ii.)**    **Mr. Pierce Can Establish Direct Evidence of Discrimination Based on Age and a Perceived Disability, and in Any Event Submits *Significant* Evidence of Discriminatory Intent**

The DRBA argues that under ADEA and ADA, Mr. Pierce cannot establish an inference of discrimination, a hostile work environment,[14] or pretext. However, the record evidence, taken in the light most favorable to Mr. Pierce as required, establishes that *from the day Mr. Pierce entered the academy*, he was subject to blatant discrimination due to his age and related *unfounded* concerns about his perceived health conditions for the remainder of his employment, including directly as it pertained to decision making. As the treatment of Mr. Pierce largely overlaps as his perceived health directly related to his age, Mr. Pierce addresses the same collectively.

A plaintiff in an employment discrimination action may establish a *prima facie* case either through direct evidence of discrimination, *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 83 L. Ed. 2d 523, 105 S. Ct. 613 (1985), or through the framework set out in *McDonnell*

---

[13] ***"When a defendant's argument regarding a plaintiff's qualifications is intertwined with its assertion of a legitimate reason for the employment action, courts should be careful not to collapse the entire McDonnell Douglas analysis in [the] first step."*** *Briggs v. Temple Univ.*, 339 F. Supp. 3d 466, 488-89 (E.D. Pa. 2018)(citing *Howell v. Millersville Univ. of Pa.,* 283 F. Supp. 3d 309, 323 (E.D. Pa. 2017)(quoting *Difrancesco v. A-G Adm'rs, Inc.*, No. 13-4284, 2014 U.S. Dist. LEXIS 124263, at *18 (E.D. Pa. Sep. 4, 2014)).

[14] The DRBA makes passing reference to the Third Circuit not *formally* recognizing a hostile work environment claim under the ADEA, however, "district courts within the Third Circuit have commonly recognized the same." *Jeffery v. Erie Cty.*, No. 23-84 Erie, 2024 U.S. Dist. LEXIS 52856, at *21-22 (W.D. Pa. Mar. 25, 2024)(collecting cases); *Katz v. Beebe Healthcare*, Civil Action No. 22-625-WCB, 2025 U.S. Dist. LEXIS 69517, at *36-37 (D. Del. Apr. 11, 2025)(identifying that "Based on the close parallelism between the ADEA and Title VII of the Civil Rights Act of 1964, a number of circuits have held that a hostile work environment claim can be raised in an ADEA action" and analyzing such a claim)(collecting cases); *James v. A. C. Moore Arts & Crafts Inc./Sbar's Inc.*, No. 18-063-CFC, 2019 U.S. Dist. LEXIS 32832, at *14-15 (D. Del. Mar. 1, 2019)("Although the Third Circuit has not squarely decided that the ADEA permits a claim for hostile work environment, it has held that Title VII and ADEA caselaw are 'routinely use[d] . . . interchangeably, when there is no material difference in the question being addressed.'")

*Douglas Corp. v. Green,* 411 U.S. 792 (1973) and its progeny.

If the employee does produce direct evidence of discriminatory animus, the employer must then produce evidence sufficient to show that it would have made the same decision if illegal bias had played no role in the employment decision. *Price Waterhouse,* 490 U.S. at 244-45; *Mardell,* 31 F.3d at 1225 n. 6. In short, direct proof of discriminatory animus leaves the employer only an affirmative defense on the question of "but for" cause or cause in fact. *See also Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, n. 4 (3d Cir. 1995).

"Direct evidence" is evidence sufficient to allow the jury to find that "the decision-makers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price Waterhouse,* 490 U.S. at 277 (O'Connor, J., concurring); *and see Barron v. Quest Diagnostics, Inc.*, 2010 WL 701956 (E.D.Pa.2010). [E]vidence of remarks of the employer that reflect a discriminatory attitude, comments which demonstrate a discriminatory animus in the decisional process, or comments uttered by individuals closely involved in employment decisions all may constitute direct evidence." *King v. United States,* 553 F.3d 1156, 1161(8th Cir.2009) (citation and internal quotation marks omitted); *See, e.g.*, *Beshears v. Asbill,* 930 F.2d 1348, 1354 (8th Cir.1991)(the court held that an employer's oral statement, "older employees have problems adapting to changed and new policies," was direct evidence of age discrimination).[15]

***If a plaintiff "'shows direct evidence that, if believed by a jury, would be sufficient to win***

---

[15] *See also Wright v. Southland Corp.,* 187 F.3d 1287 (11th Cir. 1999)(reversing district court's summary judgment ruling for employer because employee produced direct evidence by testifying that two of his managers told him he was too old to work within 3 months of his termination); *Wexler v. White's Fine Furniture,* 317 F.3d 564, 570-72 (6th Cir. 2003)(reversing decision because of various age related comments including "pops" and "old man"); *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 441 (5th Cir. 2011)(same); *Lindsey v. American Cast Iron Pipe Co.,* 772 F.2d 799, 801 (11th Cir.1985)(supervisor's statement that plaintiff would not be considered for upcoming position because company would be looking for younger person than plaintiff constituted direct evidence of discrimination based on age); *Williams v. General Motors Corp.,* 656 F.2d 120, 129 (5th Cir. 1981)(scrap of paper on which was written "Too old-Lay Off" constituted direct evidence).

*at trial,' summary judgment is inappropriate." Burton v. Plastics Research Corp.*, 134 F.Supp. 2d 881, 888-89 (E.D. Mich. 2001)(citations omitted).

First and foremost, the Academy's *own witnesses* have ***admitted*** in documentation and testimony that ***they directly utilized Mr. Pierce's age and perceived health conditions in making decisions pertaining to his training***, including failing him in testing. This is most evident as it pertains to the baton testing that Johnson initially failed Mr. Pierce for, which he *directly admitted* in documentation, testimony, and a recorded hearing that he made the decision to stop because of Mr. Pierce's "age" and because he was "afraid of what was going to happen" with regard to his health.[16] He also literally sat Mr. Pierce down on several occasions *close in time to his dismissal*, with other staff members, and directly told him that he was concerned about his ability to proceed forward with the upcoming training regimen because of a concern for his health and a fear that he could have a "heart attack" or a "cardiac" incident, saying not to take it personally if they stop his training in order to "save you from yourself"; that it was in his own best interest. The Academy also required him, disparately from others, to purchase and don a ***heart monitor*** and call out his heart rate in front of other cadets, ***admittedly because of his age and concerns about his health in completing training.***

Separately from these direct comments regarding the Academy's belief that Mr. Pierce would be *unable* to safely complete his training to his age and related health, *the entirety of its staff* made comments to Mr. Pierce ***on a daily basis***[17] pertaining to his age and beliefs about his

---

[16] This was all despite the lack of any *reasonable* basis to believe that Mr. Pierce suffered from any disabilities, as instructors were well aware that Mr. Pierce had already gone through a grueling admission and vetting process, was passing all of the testing that he had performed, was physically cleared by physicians, was outperforming his younger counterparts that did not receive such treatment, and literally telling them that he did not have any such health issues.
[17] This is unequivocally sufficient to establish the severe or pervasive element of his claim. *See Jajua v. Diakon Lutheran Soc. Ministries*, 299 F. Supp. 3d 645, 658 (E.D. Pa. 2018)("discriminatory conduct need not be both severe and pervasive to form the basis of a hostile work environment claim"). Such commentary and actions are also objectively humiliating, and he provided substantial testimony regarding how humiliating it was as well. In a hostile work environment case, "[a] [p]laintiff's deposition testimony is sufficient to show the existence of a material factual

health, disparately from his younger counterparts, including calling him "Pops," "Old man," "Pop-Pop," "Grandpop," "Old Bastard," "Stone Age," "a liability," or the "senior citizen," asking "why the hell are you doing this at your age," *if he was going to live*, why he is hyperventilating (when he wasn't), to "raise [his] old ass hand," if he was "in cardiac arrest," grouping him with other older individuals calling them the "old bastards," and claiming "I don't want to be responsible for you dying," "your old ass won't be able to apprehend anyone," to "keep running past Pops even if he is lying face down on the floor," and other comments pertaining to his age, health, and perceived inability to handle more extreme training. This harassment consistently caused Mr. Pierce to be laughed at by his fellow cadets, who also joined in on the harassment due to the openly permitted targeting from staff.

Aside from disparate commentary, Mr. Pierce was also subjected to disparate treatment regarding standards for testing and drills. For instance, while he was required to retake certain tests simply for breathing heavily, other younger employees who were not perceived as disabled were not required to do so, and were not even failed for showing complete breakdowns of fatigue or falling down, which should have actually resulted in failure or removal. He was similarly humiliated in front of the other cadets for false reasons disparately from them, such as staff orchestrating a claim that he was sleeping and threatening his career, without justification.

Furthermore, the fact that the only other individual over 40 was also dismissed for a subjective testing failure, and that another younger candidate was disparately permitted to return to the academy at the same point in training after being dismissed for such a failure, is similarly compelling evidence of the Academy's intent.

Not only was this information corroborated or testified to directly by Academy witnesses,

---

issue for trial." *Wallace v. United Parcel Serv.*, 2006 WL 1806404, at *6 (D.N.J. June 29, 2006), *aff'd*, 2007 WL 2988582 (3d Cir. 2007).

but it was already fully corroborated by a separate witness, Joshua Carter, who attended the academy and directly witnessed the harassment.

Although the DRBA appears to make a vague argument that they were not the ones who directly made the comments or acted disparately towards Mr. Pierce, this does not absolve them of liability. Not only was the Academy the DRBA's agent (and Mr. Pierce's joint employer- *See* Dover Resp. Brief; 29 U.S.C.S. § 630(b)) when utilizing them for training and entrusting them with the care of employees such as Mr. Pierce, and therefore responsible for their acts, but numerous courts have also held that employers can be liable even for the actions of third-parties when they fail to rectify such conduct after learning about it.[18]

The DRBA's leadership, and Mr. Pierce's management specifically, made *very clear* to Mr. Pierce in the leadup to training at the Academy, which he was *require to attend*, that **they**

---

[18] "Although the Third Circuit has not addressed the question of an employer's liability for non-employee behavior, a number of district courts in this circuit, and other circuit courts, have determined that an employer is liable for the harassment of an employee by a non-employee when (1) the employer knows or should have known of the conduct and (2) fails to take immediate and appropriate corrective action. *Poe-Smith v. Epic Health Servs.*, No. 16-660-LPS, 2017 U.S. Dist. LEXIS 32907, at *6-7 (D. Del. Mar. 8, 2017)(citing *See Johnson-Harris v. AmQuip Cranes Rental, LLC*, 2015 U.S. Dist. LEXIS 88736, 2015 WL 4113542, at *8 (E.D. Pa. July 8, 2015); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 423 (4th Cir. 2014); *Dunn v. Wash. Cty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005); *Shatzer v. Rite Aid Corp.*, 2015 U.S. Dist. LEXIS 107317, 2015 WL 4879450, at *6 (W.D. Pa. Aug. 14, 2015); *Armstead v. Exec. Cleaning & Supply, Inc.*, 2014 WL 4659935, at *13 (M.D. Pa. Sept. 17, 2014); *Mongelli v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 491 F. Supp. 2d 467, 477 (D. Del. 2007)); *Guthrie v. Baker*, 583 F. Supp. 2d 668, 679 (W.D. Pa. 2008)(finding a hostile work environment based on a non-employee off of employer grounds)(collecting cases); *Gentile v. DES, Props.*, No. 3:08-CV-2330, 2012 U.S. Dist. LEXIS 94657, at *13-14 (M.D. Pa. July 9, 2012); *Galdamez v. Potter, 415 F.3d 1015, 1022* (9th Cir. 2005)(collecting cases)("An employer may be held liable for the actionable third-party harassment of its employees where it ratifies or condones the conduct by failing to investigate and remedy it after learning of it."); *Gunther v. Shelter Grp.*, No. 13-04739 (RMB), 2014 U.S. Dist. LEXIS 108881, at *11 (D.N.J. Aug. 7, 2014)("an employer may be liable for hostile work environment sexual harassment committed by certain non-employees (e.g., patrons or independent contractors) if the employer knew or should have known about the conduct, had control over the harasser, and failed to "promptly and effectively act to stop [the conduct.]")(collecting cases including *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1110-11 (8th Cir. 1997)(finding that employer's liability in action brought by former employees at a facility for developmentally-disabled persons turned on whether employer's response to patient's harassing conduct was "immediate and timely and appropriate in light of the circumstances"); *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1244 (10th Cir. 2001) (finding, in action by employee against employer hospital under Title VII for injuries sustained in sexual assault by patient, that one or more jurors could reasonably believe employer's preventative measures were inadequate); *Anania v. Daubenspeck Chiropractic*, 718 N.E.2d 480, 483-84 (Ohio Ct. App. 1998)(finding, in action by employees against employer chiropractic clinic under state civil rights statute, that employer could be liable for patient's behavior if it knew or should have known about the conduct and failed to take corrective action).

were _well aware_ **that his protected status as an older individual was going to be an issue for him at the Academy, yet they sent him anyway, knowing he would be subjected to a discriminatorily hostile working environment**. Specifically, while his younger counterparts were simply cautioned to stay physically fit, Mr. Pierce was _repeatedly_ directly warned by Weaver, Draham and McFadden, "**at least five times**" within the month leading up to his attendance at the Academy, including in the presence of other cadets, that **Mr. Pierce "was going to be a target because of [his] age."** He received similarly derogatory commentary from DRBA officers.

Furthermore, _while he was at the Academy_, Mr. Pierce directly complained to McFadden about the discrimination he was being subjected to based on his age and related perceived disabilities, and further complained to Draham, Weaver (who forwarded the same to McFadden), and HR, yet despite this fact, _nothing_ was done about it, no investigation was completed, and Mr. Pierce was never even given the opportunity to attend a different academy, despite being an available option.

As a result, Mr. Pierce has unquestionably submitted sufficient evidence for a jury to find the DRBA liable for discrimination against Mr. Pierce based on his age and perceived disabilities.

### iii.)     Mr. Pierce Was Perceived as Disabled

Under the ADAAA, an individual is "regarded as" having an impairment "if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."   42 U.S.C.A. § 12102(a)(3)(A). "[E]ven an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability." _Deane v. Pocono Medical Center,_ 142 F.3d 138, 144 (3d Cir.1998); _Fleck v. WILMAC Corp_., 2011 WL 1899198, at *6 (E.D. Pa. 2011) (noting the "ADAAA's de-emphasis

on an employer's beliefs as to the severity of a perceived impairment"). The Third Circuit Court of Appeals has noted that, in making this determination, "it is the employer's perception which matters, and not the employee's actual limitations…." *Vierra v. Wayne Mem. Hosp.,* 2006 U. S. App. LEXIS 3062 at * 10, n.3 (3d Cir. 2006).

There can be no genuine argument that the Academy did not perceive Mr. Pierce to be disabled. As outlined in detail in Mr. Pierce's facts and the section *supra*, incorporated *herein*, there was a plethora of comments to Mr. Pierce that the Academy's management believed that he was going to have a "heart attack," "cardiac arrest," or "die" at any moment, made him wear a heart monitor, and literally told him that ***they did not believe he would be able to complete the Academy training to become a police officer in light of those conditions***. This, on its own, is more than sufficient. However, Academy witnesses, including Johnson, event *directly admit* that they were concerned that Mr. Pierce could have a "series" of medical issues or a "medical episode," including a belief he would have a heart attack or go into cardiac arrest, which they admit was openly discussed amongst management pertaining to *every* physical testing Mr. Pierce performed, which they "game planned" for.

### iv.)    Mr. Pierce's Complaints of Discrimination are Protected Activity[19]

Although informal, Mr. Pierce's complaints nevertheless constitute protected activity. In addition to mentioning to various supervisors over the last month of his training at the Academy that he did not believe that it was appropriate to be referencing his age and health problems, most notably, promptly following his several meetings with management where he was directly

---

19 "For purposes of the first element of a prima facie case, protected activity includes not only formal charges but also 'informal protests of discriminatory employment practices, including making complaints to management' which is considered protected activity as long as 'it [is] possible to discern from the context of the statement that the employee opposes an unlawful employment practice." *Surman v. UPMC Presbyterian Shadyside* (UPMC), Civ. A. 17-184, 2018 U.S. Dist. LEXIS 173381, at *35 (W.D. Pa. Oct. 9, 2018)(citing *Jajua v. Diakon Lutheran Soc. Ministries*, 299 F. Supp. 3d 645, 656-657 (E.D. Pa. 2018)(finding that Plaintiff complaining about a manager's failure to relieve her, when specifically pointing to her willingness to relieve others, constitutes protected activity)).

informed that there was a disbelief he could continue to train based on his age and perceived disabilities, Mr. Pierce suspiciously received an unexpected phone call from McFadden just before Christmas[20] asserting that he was "worried about" Mr. Pierce,[21] at which time Mr. Pierce made exceptionally clear that he was being targeted for his age and related perceptions about his health, embarrassed and humiliated, and shared the discriminatory comments being made to him.

Thereafter, he also made complaints to both Draham and Weaver about the discrimination that he had experienced at the Academy the day after his dismissal, as he was being terminated, informing them both of the "various forms in which [he] was discriminated against and ridiculed and humiliated by the staff at the Dover Police Academy," and "expressed interest in filing a complaint." This was also forwarded to McFadden, and Mr. Pierce further escalated his complaints to human resources, leaving detailed messages, without ever receiving any response.

### v.)    Mr. Pierce Presents Sufficient Evidence of Causation and Pretext[22]

A plaintiff can establish causation by showing (1) temporal proximity between the protected activity and adverse action; (2) a pattern of antagonism after the protected act; (3) the reason for his alleged adverse action is pretextual or (4) the record taken as a whole supports an inference of retaliation. *Andes v. N.J. City Univ.*, 419 F. App'x 230, 234 (3d Cir. 2011).

To show pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably **either** (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."[23] *Burton v. Teleflex Inc.,* 707 F.3d

---

[20] Despite DRBA arguments, this obviously occurred before his termination.
[21] Obviously, as with all other issues during his training, the Academy was communicating with the DRBA about their alleged concerns regarding his age and perceived disabilities.
[22] Mr. Pierce submits that there is more than sufficient direct evidence of discrimination in this matter, which would preclude any need for a pretext analysis, but Mr. Pierce provides additional evidence nonetheless.
[23] "To discredit the employer's proffered reason … the nonmoving plaintiff must demonstrate such 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its

417, 427 (3d Cir.2013) (internal quotation marks omitted).

"Given that the *prima facie* case and pretext inquiries often overlap, **evidence supporting the *prima facie* case can be used to demonstrate pre-text**." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008)(*citing Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000)).

### 1.) <u>Evidence of Discrimination is Also Evidence of Pretext</u>

The incredible hostility, discrimination commentary, and disparate treatment the Academy displayed toward Mr. Pierce based on his age and perceived disabilities, which was known and ignored by the DRBA, not only supports a prima facie case, but also pretext.[24] Therefore, Mr. Pierce's arguments made in his prima facie case in this regard are also incorporated *herein*.

### 2.) <u>The Academy's Reasons for Dismissal Are Directly Disputed and Highly Questionable</u>[25]

---

action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act of the asserted non-discriminatory reasons." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d. Cir. 1994).

[24] *See also Natale v. E. Coast Salon Servs.*, 2014 U.S. Dist. LEXIS 138475 (D.N.J. 2014)(denying summary judgment because evidence of discriminatory comments even by a non-decision making manager constituted additional circumstantial evidence of discrimination sufficient to establish pretext); *Sesso v. Mercy Suburban Hosp.*, 2013 U.S. Dist. LEXIS 34401 (E.D. Pa. 2013)(decision maker's comments about their expectation the plaintiff would retire established sufficient evidence of pretext to avoid summary judgment when employer asserted age discrimination for not having his employment contract renewed); *Melendez-Arroyo v. Cutler-Hammer de P.R. Co.*, 273 F.3d 30 (1st Cir. 2001)(reversing grant of summary judgment for employer based upon comments by the plaintiff's immediate supervisor about general age of employees within the department); *Mandell v. County of Suffolk*, 316 F.3d 368 (2nd Cir. 2003)(reversing grant of summary judgment for the employer and finding sufficient evidence of pretext in religious discrimination case based upon pro-Christian comments by management); *Fakete v. Aetna, Inc.*, 308 F.3d 335 (3rd Cir. 2002)(reversing grant of summary judgment where manager stated he was "looking for younger single people" constituting sufficient evidence to avoid summary judgment); *Palasota v. Haggar Clothing Co.*, 342 F.3d 569 (5th Cir. 2002)(reversing grant of summary judgment where employer's management commented about needing "race horses, not plow horses" and that the plaintiff's sales techniques were "old school."); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003)(reversing grant of summary judgment when references were made to employees age by high-level management).

[25] When there is a factual dispute in an employment discrimination case about the facts surrounding adverse actions, summary judgment **must be denied**. A reasonable fact finder could determine here that Mr. Pierce did nothing wrong and that should have been obvious to Defendants, but they manufactured a reason to terminate Mr. Pierce to carry out their discriminatory/retaliatory intent. *See e.g Treaster v. Conestoga Wood Specialties, Corp.*, 2010 U.S. Dist. LEXIS 63257 (M.D. Pa. 2010)(denying summary judgment because there was a factual dispute in that the plaintiff denied making any threats allegedly resulting in her termination); *Terry v. Ashcroft*, 336 F.3d 128 (2nd Cir. 2003)(reversing grant of summary judgment where there was a factual dispute as to whether the plaintiff was actually quarrelsome, which the plaintiff denied); *Windham v. Time Warner, Inc.*, 275 F.3d 179 (2nd Cir. 2003)(finding sufficient evidence of pretext where there was a factual dispute as to whether the plaintiff actually engaged in the performance concerns claimed by the employer); *Laxton v. Gap, Inc.*, 333 F.3d 572 (5th Cir. 2003)(reversing grant of summary judgment

Aside from the tremendous direct evidence of discrimination in this matter, what is likely the most obvious evidence of pretext is that the justifications utilized by the Academy for Mr. Pierce's alleged failures of the medical test, and therefore Mr. Pierce's dismissal and termination,[26] are directly disputed and highly suspicious.

After being intentionally placed with an exceedingly "weak performer" in his first test, Mr. Pierce was informed that he failed for not removing a victim's vest despite being contradictorily directed by management prior to the test that he was not to remove any clothing from the victim, and he similarly did not fail to assess any injuries as is now being inconsistently asserted compared to what he was told.[27] Questionably, even the examination rubric for this exam has "pass" grades scribbled out and changed to "fail" grades, without explanation.[28] With regard to his second test, he was informed that he had taken "too long" to answer questions on his oral examination, despite that this was admittedly not a plausible reason for failing a cadet. He also similarly denies mixing up his answers as is now later being alleged. The fact that there is no videotaping of these two tests, despite Johnson claiming that they are *all* videotaped, is also questionable and could lead a jury to believe they were attempting to hide the same. The Academy's contradictions regarding the videotaping of training also evidence pretext,[29] as well as the fact that despite that they are not

---

when the plaintiff directly disputed accuracy of alleged conduct resulting in termination); *Hernandez v. Spacelabs Med., Inc*. 343 F.3 1107 (9th Cir. 2003)(reversing grant of summary judgment where plaintiff was able to dispute errors forming alleged basis of termination from employment).

[26] For the same reasons stated *supra*, these facts are equally applicable to the DRBA, who chose to ratify Mr. Pierce's dismissal from the Academy and terminate him despite *knowing* the discriminatory environment within the Academy both generally and pertaining to Mr. Pierce prior to his dismissal, without so much as an investigation or attempt to utilize a different academy.

[27] The Third Circuit has stated that inconsistent reasons given by the employer for terminating an employee constitute circumstantial evidence of pretext. *See Connelly v. Lane Const. Corp*., 809 F.3d 780, 792 (3d Cir. 2016)(*citing Marra v. Phila. Hous. Auth*., 497 F.3d 286, 302 (3d Cir.2007)).

[28] A jury could easily question this, and find that Mr. Pierce had actually passed, but that these marking were changed to support a failing grade.

[29] The Third Circuit has explained that to prove pretext, a plaintiff may rely on the defendant's credibility (or lack thereof). *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 638-39 (3d Cir. 1993); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 644-45 (3d Cir. 1998), *citing Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994);

*typically* videotaped, Mr. Pierce's testing disparately was upon direct request from Johnson.

Mr. Pierce's third and final test was no different, as he directly disputes the Academy's claims regarding the tightness of the tourniquet, which was allegedly the main reason for failure, as well as the other reasons alleged with regard to his testing such as recovery position, the length of time you could utilize assistance, and the length of time answer questions (which again, was admittedly not even a reason for failure, and he was informed he passed this section). A jury could quickly discard the Academy's subjective analysis of Mr. Pierce's performance.[30]

In fact, Mr. Pierce even having to retake the entire test again is suspicious given that he had *already passed* his practical portion of the exam, as other younger cadets were not required to do so with other training in the past,[31] and Rankin admitted that the *only* goal was "to see that they can correctly do the skills" (which would be displayed through the first passing grade). The circumstances of the final testing could also lead a jury to believe that Mr. Pierce *did* in fact pass, but later was informed otherwise, as the Academy does not typically allow cadets to proceed to the Q & A portion **unless they pass** the practical aspect, and could not explain why Mr. Pierce was permitted to do so despite allegedly failing. Furthermore, Mr. Pierce was disparately <u>not</u> provided with any remedial training between testing, which the Academy's own witnesses claimed was typical of all other cadets. Others had also been permitted to pass despite *admitted* testing

---

*Phillips v. Great Dane, LLC*, 2019 U.S. Dist. LEXIS 98462, at *7 (M.D. Pa. June 12, 2019)(finding pretext in part because of credibility issues)(citing *Josey*).

[30] The Third Circuit has warned that a reviewing court should very carefully scrutinize **subjective** criteria even when it's applied across the board, let alone when it is applied only selectively as in this case. *See Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir.1990) (Subjective evaluations of performance "are more susceptible of abuse and more likely to mask pretext" than objective job qualifications.) (internal quotation marks omitted).

[31] The Third Circuit makes it clear that for an employee to raise an inference of discrimination in employment discrimination cases, and/or to establish pre-text, a plaintiff can do so by showing (among other evidence) an employer's disparate treatment of other employees. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638-39 (3d Cir. 1993); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644-45 (3d Cir. 1998); *See, e.g., Palish v. K&K RX Servs., L.P.*, 2014 U.S. Dist. LEXIS 80606 (E.D. Pa. 2014)(denying summary judgment in part because a single comparator employee was given more favorable treatment as to additional time and consideration in correcting performance concerns demonstrating pretext unlike the plaintiff who was promptly terminated).

deficiencies, such as having an incorrect recovery position and failing at wound packing, only been given minor discipline for failing examinations while being on probation, having multiple prior failures, and being warned against failing any future tests, and there was no written policy regarding the number of retests that were permitted despite Mr. Pierce being dismissed after two.

Given that the factual disputes and suspicious circumstances surrounding the reasons for dismissing and terminating Mr. Pierce, a jury could easily find the same to be a pretext for discrimination, especially when considered in conjunction with the blatant discrimination he was subjected to, to the extent the same does not constitute direct evidence itself.

### 3.)    Unusually Suggestive Timing[32]

After raising concerns to supervisors over his last month of employment, Mr. Pierce engaged in protected activity to McFadden (after he suspiciously reached out claiming he was inexplicably "worried"), just before Christmas break, which would have been _mere days_ before his dismissal on December 28th and termination the following day. He also complained to various members of DRBA management the same day as his termination. This is precisely the type of unusually suggestive proximity in timing considered by the Third Circuit in finding causation and pretext. This is especially so considering the surrounding circumstances, given that this call from McFadden only came promptly after repeated meetings with Mr. Pierce wherein he was informed by management that they did not believe he could complete training given his age and perceived

---

[32] Temporal proximity, even without other evidence of causation, may create an inference of causation, and therefore pretext, if the timing is unusually suggestive. _Jalil v. Avdel Corp_., 873 F.2d 701, 708 (3d Cir.1989); _Dolleh v. Sugarhouse HSP Gaming, L.P._, No. 22-2744, 2024 U.S. Dist. LEXIS 178405, at *24 (E.D. Pa. Sep. 30, 2024)(finding 19 days' proximity in timing to be unusually suggestive of pretext, stating "courts have found anywhere from two days to three weeks as being unduly suggestive")(citing _Lichtenstein v. Univ. of Pittsburgh Med. Ctr._, 691 F.3d 294, 2012 WL 3140350, at *10 (3d Cir. 2012)); _See Petroci v. A. Envelope Co., LLC_, CIV.06-2792, 2007 WL 1993966, at *3 (E.D. Pa. July 3, 2007)(finding causation when Plaintiff was placed on a PIP 20 days after engaging in protected activity); _Sharbaugh v. W. Haven Manor, LP_, Civil Action No. 14-1723, 2016 U.S. Dist. LEXIS 161264, at *63 (W.D. Pa. Nov. 21, 2016)(finding 8 days to be unusually suggestive, stating that "Time periods of up to 10 days have been deemed suggestive of a causal link")(collecting cases)).

disabilities, and not to take it personally if they pull him from training as a result.

### 4.)    <u>Failure to Investigate[33]</u>

Defendants' blatant failures to investigate *any* of Mr. Pierce's concerns also present evidence of an intent to retaliate or discriminate against him, as well as pretext. After each of his complaints, there was never *any* investigation, he was not questioned further, no action was taken, and at most he was simply told to "hang in there" or "there is nothing more we can do." Instead, the DRBA simply allowed him to be dismissed and terminated under false pretenses after months of hostility and disparate treatment. Under these circumstances, a jury could find nothing was done because Defendants intended to terminate him for his protected conduct and/or status.

### <u>CONCLUSION</u>

Mr. Pierce respectfully submits that Summary Judgment should be denied as to all remaining claims based on the materially disputed facts at issue.

Respectfully Submitted,

**KARPF, KARPF, & CERUTTI, P.C.**

*/s/ Timothy S. Seiler*
Timothy S. Seiler, Esq.
*Admitted Pro Hac Vice*

**LAROSA & ASSOCIATES**

*/s/ John M. LaRosa*
John M. LaRosa, Esq.
Delaware Bar ID No. 4275

July 18, 2025                          *Attorneys for Plaintiff*

---

[33] *See Martinez v. Puerto Rico*, 594 F. Supp. 2d 181, 187 (D.P.R. 2009)(assertions of an employer's failure to investigate complaints of discrimination can create an inference of intended retaliation); *Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 436 (S.D.N.Y. 2014)(an employer ignoring complaints of discrimination can create an inference of discriminatory or disparate treatment) ; *Xanthakos v. City Univ. of N.Y.*, 2020 U.S. Dist. LEXIS 153272, at *15-16 (S.D.N.Y. Aug. 24, 2020) ("allegations that the company repeatedly ignored complaints of discrimination, permits at least a plausible inference that the disparities in base pay occurred as the result of intentional discrimination."); *Ellingsworth v. Hartford Fire Ins. Co.*, 2017 WL 1092341, at *8 (E.D. Pa. Mar. 23, 2017)(finding that an employer's failure to take complaints seriously or attempt to curb harassment could be used to support an inference of causation).